# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | George W. Lindberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 CR 81 - 1 | **DATE** | 11/15/2000 |
| **CASE TITLE** | USA vs. Dean Bauer | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Defendant Dean Bauer's motion to dismiss or strike mail fraud allegations (47) is denied.  Defendant's motion to strike certain allegations from the superseding indictment (50) is denied.  The trial date is reset to January 2, 2001 at 10:00a.m.  Enter memorandum opinion and order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| ✓ | No notices required. | |
| | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

number of notices

**NOV 1 6 2000**
date docketed

docketing deputy initials

EO-7
FILED FOR DOCKETING
00 NOV 15 PM 2: 51

date mailed notice

Document Number

75

SLB — courtroom deputy's initials

Date/time received in central Clerk's Office

mailing deputy initials

DOCKETED
NOV 1 6 2000

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 00 CR 81 |
| v. | ) |
| | ) Judge George W. Lindberg |
| DEAN R. BAUER, | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION AND ORDER

Defendant Dean Bauer has moved to dismiss or strike mail fraud allegations from the indictment. Specifically, he moves to dismiss allegations that he committed mail fraud, violating 18 U.S.C. §§1341, 1346, from Racketeering Acts One, Two and Four from Count One, and from Counts Two and Three. Defendant claims that the indictment does not allege all the elements of mail fraud, and that the mail fraud statute, as applied in this instance, deprives him of his due process right to notice of proscribed conduct. Defendant also moves to strike certain allegations from the indictment.

From January 1992 until January 1999, defendant served as the Inspector General (IG) in the Illinois Secretary of State's (SOS) Office. The SOS is responsible for issuing drivers' licenses to commercial and non-commercial drivers. The SOS Office administers both written exams and driving exams before issuing drivers' licenses to ensure that applicants are qualified to drive safely in Illinois. There are over 100 facilities in Illinois that issue licenses. Facilities are managed by "facility managers" who report to "zone managers."



The role of the IG is described in Section 550.210 of the Illinois Administrative Code, which reads:

> The Inspector General Department performs two functions: it investigates all allegations of wrongdoing involving personnel of the Office of the Secretary of State, and presents reports on its findings to the Secretary, Deputy Secretary, Chief of Staff, and appropriate Directors for possible disciplinary actions, and it, through its Internal Audit Division, conducts fiscal and compliance audits of Secretary of State operations.

Defendant oversaw operations in the IG Department, which also employed law enforcement agents with police powers. Originally, the IG Department was independent within the SOS Office, but on June 30, 1995, the IG Department was consolidated within the Department of Police and was renamed the Bureau of Professional Standards. At all times, the IG Department was responsible for investigating allegations of employee misconduct and for fulfilling its duties as outlined in the Illinois Administrative Code.

According to the indictment, common procedure for investigations was as follows. An IG agent would first investigate employee misconduct and then report to a supervisor in the IG Department; sometimes this was the IG himself. The supervisors would then open a case through the case initiation process. The IG agent was assigned as the "case agent," and was responsible for further investigating a situation. If an investigation revealed evidence that an SOS employee committed criminal offenses, the IG Department could inform a prosecuting authority of the criminal offenses. The indictment states that defendant's approval was necessary before IG agents could refer the alleged criminal actions to the prosecuting authority, and so defendant was ultimately responsible for initiating the Criminal Referral Process. The IG

Department could also refer the misconduct to the SOS Office's General Counsel and/or personnel department for internal disciplinary consideration.

In January 1992, then Secretary of State George Ryan appointed defendant to the IG position, where he served until January 1999. Soon after Ryan was elected to be governor of Illinois, he appointed defendant to a position in the Illinois Department of Transportation (IDOT). In October 1999, defendant resigned from the IDOT position, having qualified for pension and other financial benefits from the government because he had served as a state employee for the required minimum of eight years.

Beginning in 1992, the SOS campaign committee sponsored political fundraisers, including an SOS Office employee event in the spring. The campaign committee distributed tickets for this event to zone managers of licensing facilities, who passed the tickets on to facility managers, who in turn sold them for $100 each.

The indictment charges defendant with violating sections 1341 and 1346 in connection with three racketeering acts alleged in Count I, namely Racketeering Acts One, Two and Four, and Counts 2 and 3. 18 U.S.C. §§1341, 1346. Racketeering Act One alleges defendant's involvement in the cover-up of an alleged theft of $2,683 from the licensing facility in Naperville, Illinois. The indictment alleges that an employee of that facility stole the money to purchase political fundraising tickets. Despite substantial evidence that the employee stole the money, defendant told the case agents to cease the investigation. Moreover, he took the computer disk on which the agents' reports were saved, and he issued an administrative warning

to the alleged thief. Finally, the indictment alleges that defendant did not initiate the Criminal Referral Process regarding the employee.

Racketeering Act Two describes defendant's involvement with an incident that occurred in the Joliet licensing facility, in which an employee of that facility was accused of issuing false SOS identification documents to two lingerie models who were not yet 21 years old. The employee was a relative of then Secretary of State George Ryan's neighbor, and Ryan personally assisted this employee in obtaining his job with the SOS Office. The employee was also acquainted with defendant. The indictment alleges that when an IG agent informed defendant that they suspected this employee of misconduct, defendant told them to cease investigating the case, including interviewing the employee. Furthermore, defendant did not tell the agent that he personally knew the employee.

The indictment also alleges that defendant committed mail fraud in Racketeering Act Four. That act details defendant's involvement in investigating improprieties in the McCook licensing facility. Ms. Tammy Raynor (Raynor) was an employee at that facility. In August 1996, she met with defendant and an IG agent to inform them of illegal acts committed by Ms. Marion Seibel (Seibel), who served first as the assistant manager and later as manager of the McCook facility during the relevant time period. From August 1996 until at least July 1997, Raynor provided the IG agent with evidence that federal crimes were committed at the McCook and other licensing facilities. Defendant assigned an undercover IG agent to investigate Raynor's allegations, and that investigation uncovered the commission of many criminal offenses. Moreover, on one occasion, IG agents intervened during a criminal offense as it was

4

occurring at the McCook facility. Mr. James Myles (Myles), an applicant for license renewal,

paid Raynor $100 to purchase a political fundraising ticket in exchange for a license renewal. He

told her that Seibel had essentially sold him a license for $100 in the past. After the IG agents

identified themselves, Myles admitted that he was attempting to bribe Raynor as he had Seibel.

Upon learning of this criminal behavior, defendant did not initiate a Criminal Referral, but rather

informed the SOS General Counsel. Moreover, defendant instructed the IG case agent to store

all evidence pertaining to the McCook incidents in a folder, thus hindering further investigation.

Finally, defendant told a high-ranking SOS official to respond to Raynor's concerns, but supplied

that official with false information to use in his response. Defendant sent Raynor the letter which

incorporated his false information, and told Raynor to contact him with further concerns, rather

than to contact the IG agent with whom she had been communicating. With that, the IG

Department's investigation of Seibel ceased.

Thus, the indictment essentially alleges that at various licensing facilities in Illinois,

employees were selling political fundraising tickets for $100 in exchange for their issuing

licenses to potentially unqualified applicants, and that an SOS employee issued false SOS

identification documents to underage women. Defendant's job was to oversee the investigation

of these potential crimes. The indictment also alleges that it was defendant's responsibility to

authorize that these employees be referred to the appropriate prosecuting authorities. However,

according to the indictment, in an effort to spare the SOS from political embarrassment,

defendant buried these allegations and investigations. Defendant stood to gain because if his

political patron were spared the embarrassment, he would be in a better position to tender favors to defendant.

To survive a motion to dismiss, an indictment must: (1) state all the elements of the offense with which defendant is charged; (2) inform defendant of the nature of the offense so the defendant may prepare his defense; and (3) enable the defendant to plead the judgment as a bar to future prosecution for the same offense. *United States v. Cash*, 1996 WL 3323417, *2 (N.D.Ill. 1996). The elements of mail fraud are that a defendant (1) devised, intended to devise and participated in a scheme to defraud another of money or property, and (2) caused a mailing for the purpose of executing that scheme. 18 U.S.C. §1341. The honest services provision of the mail fraud statute states: "For the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. §1346. Additionally, the Seventh Circuit requires that to convict a defendant for violating the honest services provision, the government must show that the defendant has (1) misused his position (2) for personal gain. *United States v. Bloom*, 149 F.3d 649 (7th Cir. 1998). Finally, the Supreme Court has interpreted the statute to include a materiality element; to be mail fraud, the relevant omission or representation must be material. *United States v. Neder,* 527 U.S. 1 (1999).

In arguing for dismissal of the mail fraud count, defendant claims that the indictment did not allege the requisite elements of the offense. He first argues that the indictment did not allege that he misused his public office for personal gain. In *Bloom*, the court upheld a dismissal of an honest services mail fraud charge against an alderman because he did not "misuse his office . . .

6

for private gain." *Id.* at 655. The government erroneously characterizes *Bloom's* "private gain" language as dicta. The court stated, "an employee deprives his employer of his honest services only if he misuses his position (or the information he obtained in it) for personal gain." *Id.* at 656-57. The court could not have expressed that this is a holding more clearly. Thus an indictment for violation of the honest services provision of the mail fraud statute must allege the defendant: (1) acted in the capacity of his role as public official; and (2) gained from his actions in some personal way.

The indictment adequately alleges that defendant was acting in his capacity as a public official. A key difference between *Bloom* and this case is that Bloom was both a public official (alderman) and an attorney; his misconduct occurred when providing legal advice to his private client. So, although Bloom's advice to his client ultimately deprived the public of some tax revenue, his advice was given as a private attorney. *Id.* at 655. In this case, however, defendant is charged with acting inappropriately in his role as a public official when he terminated investigations of other government employees' wrongdoings. Thus, the allegations satisfy the first of the *Bloom* requirements because defendant is charged with using his status as a public official to defraud the public of his honest services.

*Bloom* also requires that a defendant gain personally from his actions if he is to be found guilty of depriving the public of his honest services. In *Bloom*, the court said, "in almost all of the intangible rights cases this circuit has decided . . . the defendant used his office for private gain, as by accepting a bribe in exchange for official action." *Id.* at 655. Bribery is one example of many ways in which a defendant could enjoy personal gain from his improper actions. The

indictment has properly alleged that defendant misused his public position in order to enjoy personal gain. One such benefit was to "provide political advantage to defendant's government patron, Secretary of State George Ryan." The advancement of his patron from SOS to governor could result in rewards to defendant. Moreover, the implications of the indictment's allegations are that defendant's wrongful actions contributed to his financial well-being, by helping him to retain his position as IG, and by later helping him secure his position in the IDOT, which eventually enabled him to qualify for pension and other financial benefits from the state. In this case, the indictment alleges that defendant used his public position as the IG improperly to cease investigations of employee wrongdoing which would reflect badly on his political patron, then Secretary of State George Ryan. A result of this misuse of office was that defendant secured his government job for the time required for him to obtain his pension and other retirement benefits. Therefore, the indictment's allegations satisfy the *Bloom* interpretation of section 1346.

Defendant also argues that the indictment fails to allege the element that defendant used the mails to further his scheme. Defendant claims that the mailings used to support the indictment's allegations in Racketeering Acts One and Two cannot have furthered the scheme to defraud because they happened after the investigations had formally closed. However, the alleged scheme to defraud continued after the investigations were closed. Mailing the case report after the investigation had closed could have furthered the scheme because it could help convince the authorities that defendant had conducted himself properly. With regard to the mailings in connection with Racketeering Act Four, defendant claims that Raynor caused three of the four mailings. However, this is not evident from the indictment. The fourth mailing allegedly

occurred when defendant sent false information to an official to draft a response to Raynor's allegations. This mailing could have helped further his alleged scheme to cover up employee misconduct in the McCook licensing facility. The indictment thus sufficiently alleges that defendant used the mails to further his scheme to defraud the citizens of their right to his honest services and to their money and property.

Defendant also argues that applying the honest services component of the mail fraud statute to this set of facts deprives him of his right to due process by failing to give adequate notice of the proscribed conduct. Defendant correctly states that Congress did not define "honest services" when it wrote 18 U.S.C. §1346. However, so long as the statute gives "fair and clear warning," it is constitutional. *United States v. Lanier,* 520 U.S. 259, 271 (1997).

In *Lanier*, the Supreme Court explored the "fair notice" issue in depth. The Court reasoned, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Id.* at 266. Defendant argues that the indictment attempts to apply this statute in a novel way. However, the honest services provision is frequently applied to corrupt public officials who act to further their own goals rather than those of the public they serve. Moreover, the Supreme Court rejected the notion that the facts of a pending case must be "fundamentally similar" to those of a prior case in which the statute was applied. *Id.* at 270. This standard would "lead trial judges to demand a degree of certainty at once unnecessarily high and likely to beget much wrangling." *Id.* at 270. Section 1346 is in particular need of malleability because "no court or legislature could possibly set forth affirmatively every instance of indiscretion on the part of a

public employee which might conceivably violate his or her duty of honest services." *United States v. ReBrook*, 837 F.Supp. 162, 171 (S.D. W.Va. 1993)(rejecting defense motion to dismiss honest-services charges as void for vagueness), *aff'd in part, rev'd in part*, 58 F.3d 961 (4th Cir. 1994)(affirming honest services fraud conviction).

The standard to be gleaned from *Lanier* is that a defendant's due process rights are not violated so long as a reasonable person would understand that defendant's actions are proscribed. *Lanier*, 520 U.S at 271. "The touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id.* at 267. The indictment satisfies this test. A reasonable person in defendant's position would know that someone who is responsible for investigating employee misconduct, but whose personal interests motivate him to cease, prohibit or cover-up investigations, thereby deprives the public of its right to his honest services.

The indictment's allegation that defendant lied about various actions he took to cover up the employee misconduct further supports the idea that defendant knew his actions were improper. If defendant had believed he acted appropriately, there would have been no motivation to lie. *See United States v. Bryan*, 58 F.3d 933, 942-43 (4th Cir. 1995) ("It appears from the extensive measures [the defendant] undertook to disguise his behind-the-scenes scheming that he in fact did believe in the illegality of that conduct").

Defendant also asserts that his due process rights were violated because the indictment's allegations do not demonstrate that he breached a duty to the public. In particular, defendant argues that he did not have a duty to refer the employee misconduct in Naperville, Joliet and

McCook to prosecuting authorities because the Illinois Administrative Code did not specifically require the IG to do so. However, *United States v. Martin*, 195 F.3d 961 (7th Cir. 2000), held that a public official's duties need not stem from a state law.

The government and defendant disagree over whether defendant breached a fiduciary duty to the public. "A fiduciary duty is the duty of an agent to treat his principal with the utmost candor, rectitude, care, loyalty, and good faith." *Burdett v. Miller*, 957 F.3d 1375, 1381 (7th Cir. 1992). "Public officials inherently owe a fiduciary duty to the public to make governmental decisions in the public's best interest." *United States v. Devegeter*, 198 F.3d 1324, 1328 (11th Cir. 2000). While it is commonly accepted that public officials owe a fiduciary duty to the public, not every breach of a fiduciary duty is a criminal violation. *Bloom*, 149 F.3d at 654. The issue between the government and defendant is whether defendant's alleged actions in his capacity as IG constitutued a breach of his fiduciary duty to the public sufficient to amount to mail fraud.

The indictment alleges that "pursuant to the established practice and procedures of the IG Department *under defendant Dean Bauer*, IG Agents were required to obtain the approval of defendant Dean Bauer, or in limited instances prior to January 1995, his Deputy Inspector General, before making a referral to a prosecuting authority, and thereby initiating the Criminal Referral Process" (emphasis added). Thus, in at least some instances, defendant played a major role in initiating criminal referral processes. Although the history of how the IG Department came to authorize criminal referrals is not explored in the indictment, it does allege that the IG Department undertook to perform criminal referrals, and that defendant continued this action in

some situations. If defendant made decisions about criminal referrals based on his desire to shield his political patron from embarrassment, he violated his fiduciary duty to the public. In other words, if it was indeed "established procedure" to initiate a Criminal Referral Process when evidence suggested that employees committed crimes, and if defendant, out of concern for Secretary of State Ryan, refrained from that action in the Naperville, Joliet and McCook incidents, then he deprived the public of his honest services, regardless of the fact that the IG is not charged with the function of making criminal referrals under Illinois or federal law. *See Devegeter*, 198 F.3d at 1328, quoting *United States v. Lopez-Lukis*, 102 F.3d 1164, 1169 (11th Cir. 1997) ("If the official . . . secretly makes his decision based on his own personal interests . . . the official has defrauded the public of his honest services."); (*Bloom*, 149 F.3d at 655) ("In intangible rights cases, what the employer loses is the employee's loyalty").

Finally, the indictment does allege that defendant breached certain of the duties set forth in the Illinois Administrative Code. Defendant prohibited the case agent in Joliet from even interviewing the employee suspected of providing underage women with false SOS identification documents. Regarding the McCook incident, defendant is charged with supplying an SOS official with false information to be used in an official response to an employee's allegations. If these allegations are true, then defendant did not investigate "all allegations of wrongdoing" by employees as required by the Illinois Administrative Code. While a public official's duties may be broader than those defined in a statute, they surely encompass at least those duties, and defendant's failure to meet those duties could have resulted in the deprivation of the public of his honest services.

Defendant also claims that the indictment does not adequately allege the elements of section 1341 because it does not specify what money or property defendant took from the public. True, the indictment does not elaborate on this charge, but it is sufficient that the indictment has alleged the elements of the offense. *United States v. Bates*, 96 F.3d 964, 970 (7th Cir.), *aff'd*, 522 U.S. 23 (1997). The indictment alleged the elements of 18 U.S.C. 1341, that the defendant intended to devise a scheme to defraud Illinois and its citizens of money and property by materially false and fraudulent misrepresentations and omissions. The motion to dismiss this charge will accordingly be denied.

Defendant's motion to strike certain allegations from the indictment will be examined next. Defendant first requests that section 550.210 of the Illinois Administrative Code be quoted fully in the indictment because failure to do so prejudicially misrepresents the scope of defendant's duties as IG. However, for the reasons discussed above, section 550.210 is only one factor in determining defendant's scope of duties. The superseding indictment reads:

> Pursuant to Section 550.210 of the Illinois Administrative Code, the Department of the Inspector General (hereinafter "IG Department") was obligated to perform essential functions for the SOS Office, including investigating all allegations of wrongdoing involving SOS Office Personnel (hereinafter "employee misconduct").

In comparison, section 550.210 of the Illinois Administrative Code reads:

> The Inspector General Department performs two functions: It investigates all allegations of wrongdoing involving personnel of the Office of the Secretary of State, and presents reports on its findings to the Secretary, Deputy Secretary, Chief of Staff, and appropriate Directors for possible disciplinary actions, and it, through its Internal Audit Division, conducts fiscal and compliance audits of Secretary of State operations.

The indictment never states nor suggests that defendant's role in criminal referral processes comes only from the quoted regulation. Moreover, by referring to the Illinois Administrative Code rather than quoting it directly, the indictment focuses attention on those IG responsibilities that are relevant to the offenses charged. Including only portions of the regulation is not unfairly prejudicial.

Defendant also moves to strike allegations relating to his securing the IDOT position in January 1999 because that occurred after the alleged scheme to defraud, and therefore has no connection to the charges. However, the personal gain alleged in this case – the employment of defendant by the state long enough to qualify for a pension – could not have been provided to defendant by his political patron any sooner. Therefore, the allegations regarding defendant's IDOT position are relevant.

Next, defendant moves to strike allegations regarding polygraph test results from Count One of the indictment on the basis of defendant's argument that the polygraph evidence is inadmissible. However, the indictment only refers to the polygraph evidence to show its effect on defendant's actions. For this purpose, the polygraph evidence is admissible, and not unfairly prejudicial.

With regard to allegations in Racketeering Act Two, the Joliet incident, defendant objects to the phrase "at least two lingerie models" because it is unduly prejudicial. However, because defendant himself is not charged with issuing false identification to these models, any prejudicial effect is minimal. Moreover, it is unlikely that a jury would envision a "harem of lingerie models" was receiving false SOS identification documents.

00 Cr 81

Finally, defendant moves to strike allegations in Counts One and Two that Bauer violated 18 U.S.C. §1341 by depriving Illinois citizens of its "money" and "property" on the grounds that the indictment did not establish those facts. Because the indictment has properly alleged the elements of section 1341, defendant's motion is denied.

ORDERED: Defendant Dean Bauer's motion to dismiss or strike mail fraud allegations [47] is denied. Defendant's motion to strike certain allegations from the superseding indictment [50] is denied.

ENTER:

GEORGE W. LINDBERG
District Judge

DATED: NOV 1 4 2000

15